Jaime K. Olin (SBN 243139)
jolin@nbclaw.net
Brent N. Bumgardner (Pro Hac pending)
bbumgardner@nbclaw.net
Edward R. Nelson, III (Pro Hac pending)
enelson@nbclaw.net
Jonathan H. Rastegar (Pro Hac pending)
jrastegar@nbclaw.net
Nelson Bumgardner Casto, P.C.
3131 West 7th Street, Suite 300
Fort Worth, TX  76107
Telephone:  (817) 377-9111
Facsimile:  (817) 377-3485

Attorneys for Plaintiff,
LONE STAR WIFI LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| LONE STAR WIFI LLC, | Case No.  **'14CV0821 BEN NLS** |
|---|---|
| Plaintiff; | PLAINTIFF LONE STAR WIFI'S COMPLAINT FOR PATENT INFRINGEMENT |
| v. | |
| MARRIOTT INTERNATIONAL, INC., | Demand for Jury Trial |
| Defendant. | |

Plaintiff Lone Star WiFi LLC, by counsel, alleges as follows:

### THE PARTIES

1.    Plaintiff Lone Star WiFi LLC ("Lone Star WiFi" or "Plaintiff") is a Texas limited liability company with a principal place of business at 100 E. Ferguson, Suite 806, Tyler, TX 75702.

2.    Marriott International, Inc. ("Marriott" or "Defendants") is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda,

1   Maryland 20817.   Marriott can be served with process by serving its registered

2   agent: Corporate Creations Network Inc., 131-A Stoney Circle, Suite 500, Santa

3   Rosa, CA 95401.   Upon information and belief, Marriott does business in the State

4   of California and in the Southern District of California.

5                          **JURISDICTION AND VENUE**

6        3.     This is a civil action for patent infringement arising under the United

7   States patent statutes, 35 U.S.C. § 1 *et seq.*

8        4.     This Court has jurisdiction over the subject matter of this action under

9   28 U.S.C. §§ 1331 and 1338(a).

10       5.     This Court has personal jurisdiction over Defendant by virtue of

11  Defendant's activities within this judicial district.   Upon information and belief,

12  Defendant offers products and services within this judicial district, and specifically

13  targets its activities to residents of this judicial district.   Defendant is subject to this

14  Court's specific and general personal jurisdiction pursuant to due process and/or the

15  California Long Arm Statute, due at least to its substantial, continuous, and

16  systematic business in this State and judicial district, including: (A) at least part of

17  its infringing activities alleged herein; and (B) regularly doing or soliciting

18  business, engaging in other persistent conduct, and/or deriving substantial revenue

19  from goods sold and services provided to California residents.

20       6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§

21  1391(b) - (d) and 1400(b).   On information and belief, Defendant has committed

22  acts of infringement in this judicial district, and has purposely transacted business

23  involving its accused services in this judicial district.

24                    **BACKGROUND FACTS & PATENTS-IN-SUIT**

25  **Wireless Access and the Patents-in-Suit.**

26       7.     This suit involves United States Patent Nos. 7,490,348; 8,312,286; and

27  8,583,935 (collectively, the "Patents-in-Suit").   The Patents-in-Suit are generally

28  directed to particular implementations of wireless networks in which multiple,

overlapping wireless streams provide varying levels of access to content and resources.

8.   On March 17, 2003, inventor Scott C. Harris filed Provisional Patent Application No. 60/454,694.

9.   On the basis of that priority, Mr. Harris filed Patent Application No. 10/800,472 on March 15, 2004.

10.   On February 10, 2009, the United States Patent and Trademark Office granted Mr. Harris's application, duly and legally issuing United States Patent No. 7,490,348 (the "'348 Patent"), entitled "Wireless Network Having Multiple Communication Allowances," to Harris Technology LLC.  A copy of the '348 Patent is attached as Exhibit A.

11.   On November 13, 2012, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,312,286 (the "'286 Patent"), entitled "Wireless Network Having Multiple Communication Allowances," to Harris Technology LLC.  A copy of the '286 Patent is attached as Exhibit B.

12.   On November 12, 2013, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,583,935 (the "'935 Patent"), entitled "Wireless Network Having Multiple Communication Allowances," to Lone Star WiFi LLC.  A copy of the '935 Patent is attached as Exhibit C.

**Hotels Need to Provide Multiple Wireless Networks to Satisfy Their Guests and Remain Competitive.**

13.   Wireless Internet access has become one of the most critical amenities – if not the most critical amenity – hotels offer to their guests.

14.   Several national publications and news services run periodic surveys regarding the hospitality industry.

15.    Hotel chains, hotel owners, and hotel management companies such as Defendant participate in and trust the results of such surveys to help inform their business decision-making.

16.    Indeed, hotels often cite positive findings from such surveys in their own advertising and marketing materials as evidence to potential customers why their brands and/or properties are superior.

17.    Such surveys have found overwhelming growth in the need for, and the provision of, wireless Internet access in hotel guest rooms.

18.    For example, J.D. Power and Associates is a well-known global marketing information services company that provides customer satisfaction research and market research regarding a number of industries.

19.    Each year for the past seventeen years, J.D. Power and Associates has conducted and published a study of consumer satisfaction with various hotel chains.

20.    For each of the last six years, the J.D. Power survey has found the trend regarding wireless Internet access at hotels important enough to report on it as part of the primary press release regarding the survey.

21.    In its 2010 annual survey, J.D. Power found that wireless Internet access led the "top five 'must-have' amenities for hotel guests."

22.    The 2010 survey reported that hotel properties had "increased offerings of wireless Internet access during the past several years, with 77 percent of guests in 2010 indicating they have used Wi-Fi rather than cable Internet connections in their guest room, compared with 55 percent in 2007."

23.    Mark Schwartz, director of the global hospitality and travel practice at J.D. Power, commented regarding the 2010 survey that, "guests are starting to expect wireless Internet access in their hotel rooms," because "[i]n today's digitally connected world, being able to use mobile devices or computers without interruption is considered a comfort of home that should extend to the hotel experience."

24.    In its 2011 annual survey, J.D. Power noted the disproportionally high report rate for problems with hotel Internet service: "[N]oise is the problem most commonly experienced by guests, with 16 percent indicating experiencing the issue.  However, only 43 percent of these guests indicate they reported the noise to hotel staff.  In contrast, just 13 percent of guests say they experienced a problem with the Internet connection or speed at their hotel, but 60 percent reported the problem."

25.    Indeed, guests cared so much about the wireless Internet access at hotels in 2012, J.D. Power found they "use[d] social media to complain about how slow Internet connections are at hotels," and also "to praise hotel brands that are known for fast, reliable Internet service."

26.    In its 2013 annual survey, J.D. Power noted that "[w]hile Internet usage during a hotel stay continues to steadily increase, it remains the top problem experienced by guests.  Among guests who experienced a problem during their hotel stay, 31 percent had an issue with their Internet service in terms of connection and/or speed.  Interestingly, overall satisfaction among guests who experienced difficulties connecting to the Internet is 133 points lower than among those who did not have problems, whether Internet access was included in the room rate or not."

27.    Another example of a national service reporting data regarding the hotel industry is TripAdvisor.  TripAdvisor claims to be the world's largest travel website, aggregating reviews and advice regarding airlines, hotels, restaurants, and other travel features worldwide.

28.    In a February 17, 2011 survey, TripAdvisor polled over 1,000 U.S. accommodation owners – hoteliers, B&B owners and innkeepers – regarding their plans to attract travelers in 2011 and increase repeat customers.

29.    In the February 2011 survey, only four percent of the owners indicated they had no plans to offer in-room Internet access, which TripAdvisor referred to as "a key consumer demand."

30.     In January 2012, TripAdvisor conducted a "360 degree survey," which polled 1,248 U.S. travelers and 622 U.S. hotel managers and owners.

31.     TripAdvisor's 360 degree survey found that wireless Internet access was the most important hotel amenity among eighty-five percent of travelers who most often booked hotels.

32.     Moreover, in that same 360 degree survey, TripAdvisor found that ninety-nine percent of hotel owners and managers considered wireless Internet access the most important amenity.

33.     Even more recently, in July 2012 TripAdvisor released the results of its biannual "Industry Index," incorporating responses from 25,517 accommodation owners and managers worldwide.

34.     Eighty-one percent of hoteliers in North America reported being profitable over the six month period prior to the Industry Index survey, conducted during June 2012, while thirty percent of U.S. accommodation owners reported their businesses were "extremely profitable" or "very profitable" over that period.

35.     Of the properties that did not currently offer in-room WiFi in June 2012, thirty-six percent indicated they planned to add that feature in the next six months.

36.     Like TripAdvisor, Hotels.com is an Internet service that provides reservation services and information for travelers about prospective destinations. Hotels.com conducts periodic surveys on traveler satisfaction and opinions.

37.     In January 2012, Hotels.com conducted a survey regarding travelers' preferences in hotel amenities. In response to "[q]uestion after question, guests reported that free Wi-Fi [wa]s a must when choosing a hotel room and that this amenity overwhelmingly factored into the decision on which hotel to book."

38.     But it is not just third parties who have noticed the ever-increasing importance of providing wireless Internet access in hotel guest rooms.  Hotel chains

1    and their executives— including Marriott itself—have also noticed the trend

2    themselves.

3          39.    On February 14, 2012, the Travel section of USA Today reported the

4    results of a roundtable discussion between five hotel CEOs the newspaper had

5    conducted when they were gathered together for the Americas Lodging Investment

6    Summit in January.  Each CEO was asked what his hotel was doing in response to

7    Internet access becoming a top amenity for travelers.

8          40.    Former Marriott CEO J.W. "Bill" Marriott Jr. commented that, "It's a

9    huge problem. Everyone wants to talk in the room and they want to download

10   everything they can. It's getting to be quite a challenge."

11         41.    Richard Solomons, CEO of InterContinental Hotels Group, agreed that

12   "We all see it as an issue. It's one of the big dissatisfiers that you see in a lot of

13   hotels."

14         42.    Former Carlson CEO Hubert Joly responded that, "Free Internet is the

15   greatest demand in terms of amenities of the travelers. It's almost like having water

16   or air conditioning in the room."

17         43.    Choice Hotels CEO Steve Joyce added that "Whether you charge [for

18   wireless Internet access] or whether it's free, you'd better have some dependability

19   and reliability because it will become the single source of complaints."

20         44.    When asked by the Wall Street Journal in a June 15, 2012 interview

21   what amenities she saw spreading in the industry, Four Seasons Chief Executive

22   Officer Kathleen Taylor responded that "Technology is one of the leading edge

23   issues for consumers in all segments. It's less an amenity and more like hot water,

24   in the sense that everyone is expected to have it."

25         45.    On August 20, 2012, hotel chain Starwood Hotels and Resorts

26   Worldwide, Inc. issued a press release entitled, "Four Points by Sheraton Survey

27   Reveals Mobile Device Habits of Business Travelers Worldwide." *See,*

28

<http://www.businesswire.com/news/home/20120820005808/en/Points-Sheraton-Survey- Reveals-Mobile-Device-Habits>.

46.    In the August 2012 release, Starwood explained that its brand Four Points by Sheraton had commissioned a hotel business and technology study in which 6,000 business travelers, including 1,000 from the United States, were surveyed.

47.    According to the August 2012 press release, the Four Points by Sheraton survey found that, irrespective of nationality, the majority of respondents brought three or four mobile, wireless-capable devices with them on the road.

48.    Those devices most often included a smartphone, followed by tablet computers, music players, and laptops.

49.    The Four Points by Sheraton survey found that checking their smartphone was the most common activity respondents undertook first upon waking up in their hotel. Checking Facebook and Twitter also ranked among the top five post-wake up activities.

50.    Business traveler respondents to the Four Points by Sheraton survey explained their primary purposes for traveling with mobile devices were to keep up with email, Internet browsing and social networking, and maintaining communications with their office.

51.    Over sixty percent of the business traveler respondents to the Four Points by Sheraton survey said they believed traveling with technology makes their lives significantly easier and more convenient.

52.    In the August 2012 press release about the Four Points by Sheraton survey, Starwood's senior vice president, specialty select brands, Brian McGuinness, called the results of the study "compelling."

53.    Mr. McGuinness concluded the Four Points by Sheraton survey "affirms that the Four Points brand is meeting a continued need by offering

1   complimentary WiFi or in-room Internet access, and by continuing to expand

2   bandwidth throughout the portfolio."

3       54.     The availability and reliability of wireless Internet access is not only

4   important with respect to the ability to fill guest rooms.  It also impacts the ability

5   to book meeting spaces as an additional source of revenue.

6       55.     In 2010, the late Steve Jobs was famously forced to ask the audience at

7   Apple's developer conference to shut off their laptops and phones after his

8   introduction of the iPhone 4 was derailed because of an overloaded Wi-Fi network.

9   Since then, venues that hold meetings and trade shows have been increasingly

10  cognizant of their wireless Internet capabilities.

11      56.     Earlier this year, the New York Times published an article entitled,

12  "The Trade Show, Updated," which reported *inter alia* that, "[h]otels that do

13  lucrative meetings and conference business are also increasingly seeing the need to

14  improve their technology."

15      57.     In particular, Brad Weaber, the executive vice president for event

16  services at SmithBucklin, a company that arranges conventions and meetings of all

17  kinds, commented that "Today, you can't not have full connectivity for your

18  attendees or they won't come."

19      58.     Moreover, in an effort to keep guests and meeting attendees—and their

20  associated spending on drinks, food, and other incidentals—within the bounds of

21  their properties, hotel chains have increasingly sought to make their lobbies and

22  common spaces more desirable as places to work and socialize.  Part of this effort

23  has been ensuring the availability of wireless Internet access in such common areas.

24      59.     For example, when asked by USA Today about the effort to

25  "reinvent[] lobbies to make them inviting, social places," Bill Marriott Jr.

26  confirmed that, "The feedback is terrific, because it's an opportunity to socialize,

27  have something quick to eat, sit in the lobby and work on your computer.  At this

28  hotel here (LA Live), you look at the people in all their little pods and areas talking,

1   meeting, visiting and eating.  It's a socialization of the lobby, which has never

2   happened before in our industry, because people used to go in the lobby, check in,

3   check out and then leave.  Today, they're all over the lobby, and they're coming

4   back to the hotel and using the lobby for a drink afterward."

5   **Defendant Owns and/or Operates Marriott Properties**

6   60.   Marriott is one of the world's largest hotel chains, with more than

7   3800 properties across 19 brands throughout the world.

8   61.   Marriott operates and/or manages ("operates"), franchises, and licenses

9   hotels and timeshare properties.

10  62.   Marriott operates around 1,055 properties under long-term

11  management agreements with property owners, 38 properties under long-term lease

12  agreements with property owners, and 6 properties as owned.

13  63.   Of the properties operated by Marriott, approximately 734

14  (representing approximately 193,294 rooms) are located in the United States.

15  64.   Each of the 734 properties operated by Marriott in the United States

16  belongs to one of the following Marriott brands:

17      a.      Marriott Hotels & Resorts;

18      b.      Marriott Conference Centers;

19      c.      JW Marriott;

20      d.      Renaissance Hotels;

21      e.      Gaylord Hotels;

22      f.      The Ritz-Carlton;

23      g.      Courtyard;

24      h.      Fairfield Inn & Suites;

25      i.      SpringHill Suites;

26      j.      Residence Inn; and

27      k.      TownePlace Suites.

28

65.     Marriott's operating responsibilities include hiring, training, and supervising the managers and employees required to operate the facilities and for purchasing supplies.

66.     Marriott's operating responsibilities also include providing centralized reservation services and national advertising, marketing, and promotional services, as well as various accounting and data processing services.

67.     Upon information and belief, Marriott also prepares and implements annual budgets for its hotels and resorts and allocates funds for periodic maintenance and repair of buildings and furnishings.

68.     Upon information and belief, Marriott employs technical personnel to design, implement, and maintain the facilities' wireless networks and/or oversee vendors performing such services.

**The Multiple, Overlapping Wireless Networks Maintained at Marriott's Properties Infringe the Patents-in-Suit.**

69.     The properties operated by Marriott maintain multiple, overlapping wireless networks.

70.     Upon information and belief, Marriott creates and maintains brand standards for the individual properties it operates.

71.     Brand standards are used in the hotel industry to ensure that individual properties in hotel chains implement and maintain certain aspects of the properties' exterior appearance, facilities, guest rooms, etc., in a manner consistent with the hotel brand.  One such aspect that is commonly covered by brand standards is provision, implementation, and maintenance of wireless Internet access.

72.     Upon information and belief, Marriott propounds brand standards for the individual properties it operates that includes mandated standards for the provision, implementation and maintenance of wireless Internet access.

**Marriott Provides Internet Access at the Properties it Operates.**

73.    Marriot maintains network infrastructures comprising multiple overlapping networks at its properties, including wired and wireless networks.  The networks are configured to provide different methods of access and levels of service.  Such network configurations are provided by Marriot for the benefit of guests, patrons, and employees.

74.    Such networks may include lobby networks.

75.    Such networks may include guest networks.

76.    Such networks may include conference room networks.

77.    Such networks may include private, secure networks.

**MARRIOTT BRANDS**

78.    Of Marriott's 19 brands, 12 are present in the United States, accounting for approximately 3,130 properties and 504,650 rooms.

79.    Of the 12 Marriott brands present in the United States, 11 contain properties that are operated/managed by Marriott or one of its domestic subsidiaries.

**Marriott Hotels & Resorts**

80.    Marriott Hotels & Resorts is Marriott's global flagship brand, primarily serving business and leisure upper-upscale travelers and meeting groups.

81.    Marriott Hotels & Resorts has approximately 315 properties in the United States.

82.    Upon information and belief, Marriott operates a number of the Marriott Hotels & Resorts properties in the United States, through itself or one of its domestic subsidiaries.

83.    Upon information and belief, all Marriott Hotels & Resorts properties in the United States offer high-speed Internet access.

1    **Marriott Conference Centers**

2        84.    Marriott Conference Centers are either used exclusively by employees

3    of sponsoring organizations or marketed to outside meeting groups and individuals.

4        85.    There are 10 Marriott Conference Centers in the United States.

5        86.    Upon information and belief, Marriott operates a number of the

6    Marriott Conference Centers properties in the United States, through itself or one of

7    its domestic subsidiaries.

8        87.    Upon information and belief, all Marriott Conference Centers

9    properties in the United States offer high-speed Internet access.

10   **JW Marriott**

11       88.    JW Marriott is a global luxury brand made up of a collection of hotels

12   and resorts that cater to accomplished, discerning travelers seeking an elegant

13   environment with discreet personal service.

14       89.    JW Marriott has approximately 22 properties in the United States.

15       90.    Upon information and belief, Marriott operates a number of the JW

16   Marriott properties in the United States, through itself or one of its domestic

17   subsidiaries.

18       91.    Upon information and belief, all JW Marriott properties in the United

19   States offer high-speed Internet access.

20   **Renaissance Hotels**

21       92.    Renaissance Hotels is a global, full-service brand that targets lifestyle-

22   oriented business travelers who are "discoverers at heart" and who value business

23   travel as a way to explore the world.

24       93.    Renaissance Hotels has approximately 79 properties in the United

25   States.

26       94.    Upon information and belief, Marriott operates a number of the

27   Renaissance Hotels properties in the United States, through itself or one of its

28   domestic subsidiaries.

95.    Upon information and belief, all Renaissance Hotels properties in the United States offer high-speed Internet access.

**Gaylord Hotels**

96.    Gaylord Hotels is a leader in the group and meetings business and complements Marriott's existing network of large convention hotels.

97.    Gaylord Hotels has approximately 5 properties in the United States.

98.    Upon information and belief, Marriott operates a number of the Gaylord Hotels properties in the United States, through itself or one of its domestic subsidiaries.

99.    Upon information and belief, all Gaylord Hotels properties in the United States offer high-speed Internet access.

**Courtyard**

100.    Courtyard is Marriott's hotel product designed for the upper-moderate price tier.

101.    Courtyard has approximately 817 properties in the United States.

102.    Upon information and belief, Marriott operates a number of the Courtyard properties in the United States, through itself or one of its domestic subsidiaries.

103.    Upon information and belief, all Courtyard properties in the United States offer high-speed Internet access.

**Fairfield Inn & Suites (includes Fairfield Inn and Fairfield Inn & Suites)**

104.    Fairfield Inn & Suites is an established leader in the moderate-price tier segment and is targeted primarily at value-conscious business travelers.

105.    Fairfield Inn & Suites has approximately 678 properties in the United States.

106.    Upon information and belief, Marriott operates a number of the Fairfield Inn & Suites properties in the United States, through itself or one of its domestic subsidiaries.

107. Upon information and belief, all Fairfield Inn & Suites properties in the United States offer high-speed Internet access.

**Residence Inn**

108. Residence Inn is North America's leading upscale extended-stay hotel brand designed for frequent and extended stay business and leisure travelers staying five or more nights.

109. Residence Inn has approximately 602 properties in the United States.

110. Upon information and belief, Marriott operates a number of the Residence Inn properties in the United States, through itself or one of its domestic subsidiaries.

111. Upon information and belief, all Residence Inn properties in the United States offer high-speed Internet access.

**SpringHill Suites**

112. SpringHill Suites is Marriott's all-suite brand in the upper-moderate-price tier primarily targeting business and leisure travelers who are looking for extra space and style with a great value.

113. SpringHill Suites has approximately 297 properties in the United States.

114. Upon information and belief, Marriott operates a number of the SpringHill Suites properties in the United States, through itself or one of its domestic subsidiaries.

115. Upon information and belief, all SpringHill Suites properties in the United States offer high-speed Internet access.

**TownePlace Suites**

116. TownePlace Suites is a moderately priced extended-stay hotel brand designed to appeal to business and leisure travelers who stay for five nights or more.

117.   TownePlace Suites has approximately 208 properties in the United States.

118.   Upon information and belief, Marriott operates a number of the TownePlace Suites properties in the United States, through itself or one of its domestic subsidiaries.

119.   Upon information and belief, all TownePlace Suites properties in the United States offer high-speed Internet access.

**The Ritz-Carlton**

120.   The Ritz-Carlton is one of the world's leading global luxury lifestyle brands, with hotels and resorts renowned for their extraordinary locations, inspired design, and legendary service.

121.   The Ritz-Carlton has approximately 68 properties in the United States.

122.   Upon information and belief, Marriott operates a number of the Ritz-Carlton properties in the United States, through itself or one of its domestic subsidiaries.

123.   Upon information and belief, all The Ritz-Carlton properties in the United States offer "in-room high-speed Internet access."

## CLAIM I: INFRINGEMENT OF THE '348 PATENT

124.   Plaintiff realleges and incorporates by reference paragraphs 1- 123 of this Complaint as if fully set forth herein.

125.   Plaintiff is the sole holder of all substantial rights to the '348 patent.

126.   By owning, operating, and managing hotels and resorts in a way that includes maintaining multiple, overlapping wireless networks with differing levels of access as detailed above, Defendant directly infringes one or more claims of the '348 patent, including but not limited to Claim 4.

127.   Defendant's infringement is ongoing.

128. Marriott, its domestic subsidiaries, and the individual properties operated by Marriott have not taken or been granted a license to the '348 patent.

129. Plaintiff Lone Star WiFi has been, and continues to be, damaged by Defendant's infringement.

## CLAIM II: INFRINGEMENT OF THE '286 PATENT

130. Plaintiff realleges and incorporates by reference paragraphs 1-129 of this Complaint as if fully set forth herein.

131. Plaintiff is the sole holder of all substantial rights to the '286 patent.

132. By owning, operating, and managing hotels and resorts in a way that includes maintaining multiple, overlapping wireless networks with differing levels of access as detailed above, Defendant directly infringes one or more claims of the '286 patent, including but not limited to Claim 1.

133. Defendant's infringement is ongoing.

134. Marriott, its domestic subsidiaries, and the individual properties operated by Marriott have not taken or been granted a license to the '286 patent.

135. Plaintiff Lone Star WiFi has been, and continues to be, damaged by Defendant's infringement.

## CLAIM III: INFRINGEMENT OF THE '935 PATENT

136. Plaintiff realleges and incorporates by reference paragraphs 1-135 of this Complaint as if fully set forth herein.

137. Plaintiff is the sole holder of all substantial rights to the '935 patent.

138. By owning, operating, and managing hotels and resorts in a way that includes maintaining multiple, overlapping wireless networks with differing levels of access as detailed above, Defendant directly infringes one or more claims of the '935 patent, including but not limited to Claim 1.

139. Defendant's infringement is ongoing.

140. Marriott, its domestic subsidiaries, and the individual properties operated by Marriott have not taken or been granted a license to the '935 patent.

141.   Plaintiff Lone Star WiFi has been, and continues to be, damaged by Defendant's infringement.

## JURY DEMAND

142.   Plaintiff demands a trial by jury on all issues.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Lone Star WiFi respectfully requests the following relief:

A.   A judgment holding the Defendant liable for infringement of the Patents-in-Suit asserted against it;

B.   An accounting for damages resulting from the Defendant's infringement of the Patents-in-Suit asserted against it, together with pre-judgment and post-judgment interest;

C.   A judgment holding this Action to be an exceptional case, and an award to Plaintiff for its attorney's fees and costs pursuant to 35 U.S.C. § 285; and

D.   Such other and further relief as this Court deems just and proper.

DATED:  April 4, 2014

**NELSON BUMGARDNER CASTO, P.C.**

By:/S/ Jaime K. Olin
Jaime K. Olin (SBN 243139)
Brent N. Bumgardner (Pro Hac pending)
Edward R. Nelson, III (Pro Hac pending)
Jonathan H. Rastegar (Pro Hac pending)

Attorneys for Plaintiff,
LONE STAR WIFI LLC

PLAINTIFF LONE STAR WIFI LLC'S
COMPLAINT FOR PATENT INFRINGEMENT                    -18-